UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARCUS L. MOSES, <br><br> *Plaintiff*, <br><br> v. <br><br> NEIGHBORHOOD REINVESTMENT CORPORATION d/b/a NEIGHBORWORKS AMERICA, <br><br> *Defendant*. | Civil Action No. 23-2246 (LLA) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Marcus L. Moses sues his former employer, Defendant Neighborhood Reinvestment Corporation ("NRC"), pursuant to the National Defense Authorization Act ("NDAA"), 41 U.S.C. § 4712, *et seq.*, the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and District of Columbia common law. ECF No. 12 ¶ 10. The NRC moves to dismiss for failure to state a claim. ECF No. 14. For the reasons explained below, the court will grant in part and deny in part the NRC's motion and dismiss Count III.

**I.   Factual Background**

In resolving the NRC's motion to dismiss, the court accepts the following factual allegations from Mr. Moses's complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The NRC is a congressionally chartered nonprofit. ECF No. 12 ¶ 15. It was formed in 1978 to "create opportunities for people to live in affordable homes, improve their lives, and strengthen their communities." *Id.* ¶ 16. Today, it "supports a network of nearly 250 nonprofit housing and community development organizations" across the United States. *Id.* ¶ 17. At least

90% of the NRC's annual budget comes from federal appropriations and grants from the U.S. Department of Treasury ("Treasury") or the U.S. Department of Housing and Urban Development ("HUD"). *Id.* ¶ 18. The NRC is required by statute to use its federal funds in compliance with "administrative and cost standards issued by the Office of Management and Budget similar to standards applicable to non-profit grantees and educational institutions." 42 U.S.C. § 8104(e); ECF No. 12 ¶ 20. Those standards are codified at 2 C.F.R. § 200 ("Part 200"), which regulates— among other things—procurement procedures, conflict-of-interest disclosure obligations, audit requirements, and financial reporting rules. ECF No. 12 ¶¶ 21-27.

Mr. Moses began working at the NRC in September 2018 as Senior Vice President of Procurement. *Id.* ¶¶ 2, 28. In that role, he "overs[aw] procurement activities that expended hundreds of millions of dollars received from the federal government each year." *Id.* ¶ 2. He reported directly to Executive Vice President and Chief Financial Officer Rebecca Bond from September 2018 to May 2021, and then to Kemba Esmond after she replaced Ms. Bond. *Id.* ¶¶ 29-30.

### A.     Housing Partnership Network Contract

In December 2019, the NRC's General Counsel, Rutledge Simmons, told Mr. Moses that the NRC had awarded a $1 million contract to the Housing Partnership Network ("HPN") several months before. *Id.* ¶ 36. Mr. Moses had not previously known about the contract because the NRC had negotiated and signed it without his department's involvement. *Id.* ¶ 37. The contract was federally assisted—it was "paid for, in whole or in part, with funds received from the federal government" but it "d[id] not involve the federal government as a party to the contract." *Id.* ¶¶ 3 n.5, 38. Mr. Moses told Mr. Simmons that, by negotiating and awarding a federally assisted contract without the procurement department's involvement, the NRC had violated both its own policies and Part 200. *Id.* ¶ 38. Mr. Simmons "admitted . . . that NRC had created a

2

noncompliance minefield"; that the NRC had awarded the HPN contract noncompetitively; and that the NRC had failed to memorialize the contract in writing. *Id.* ¶ 39. He then asked Mr. Moses to prepare a written contract reflecting the NRC's and HPN's agreement, backdate the contract to the date the parties had entered into the agreement, sign the contract, and add it to the NRC's procurement database. *Id.* ¶ 40. Mr. Moses knew that these actions would violate Part 200 and refused to do so. *Id.* ¶¶ 40-41. He explained to Mr. Simmons that the NRC had violated Part 200 in awarding the HPN contract and that performing the actions Mr. Simmons was requesting would also violate Part 200. *Id.* ¶ 41.

Mr. Moses reported Mr. Simmons's request to Ms. Bond. *Id.* ¶ 42. He recommended that Mr. Simmons and Susan Ifill (the NRC's Executive Vice President and Chief Operating Officer) "prepare a memorandum chronicling the HPN contract's checkered history" and spelling out corrective actions and then attach that memorandum to the HPN contract. *Id.* Although Ms. Bond approved these recommendations, "Simmons and Ifill did not, and they communicated their displeasure to Moses." *Id.* ¶¶ 43-44.

In April 2020, Mr. Moses was asked to sign an award determination memorandum for the HPN contract. *Id.* ¶ 45. Although the memorandum "admitted that NRC had negotiated and awarded the contract without the procurement department's involvement [and] spelled out required corrective actions," *id.* ¶ 48, "it was not accompanied by a written copy of the HPN contract" and it "contained several lies, including . . . that [the HPN program's] customer base was vetted and . . . that monthly meetings were being held with the procurement department to review procurement actions related to the [NRC's] program," *id.* ¶ 49. Mr. Moses refused to sign the memorandum. *Id.* ¶ 50. He reported his concerns to Mr. Simmons and Chief Audit Executive Frederick Udochi and asked that they formally investigate the matter. *Id.* ¶¶ 3, 51. The NRC did

not do so, and it "did not perform any of the corrective actions spelled out in the memorandum." *Id.* ¶¶ 52-54.

In December 2021, Procurement Liaison Robyn Germaine told Mr. Moses that Ms. Ifill and Marietta Rodriguez, the NRC's President and Chief Executive Officer, "had renegotiated the HPN contract—to expend federal funds in excess of the $1,000,000 limit—without involving the procurement department . . . [and] were coercing employees in NRC's business departments to add federal funds to the HPN contract without involving the procurement department." *Id.* ¶ 55. Mr. Moses knew that, if true, these allegations "signaled flagrant violations of PART 200's formal procurement requirements." *Id.* ¶ 56. He investigated Ms. Germaine's allegations and determined that they were true: the NRC had paid HPN more than $800,000 above the $1 million contract limit and had paid for it "by unlawfully charging the associated procurements and transactions to a HUD grant." *Id.* Mr. Moses reported these violations to Mr. Simmons and Mr. Udochi and requested an internal audit. *Id.* ¶ 57. The NRC did not investigate or take corrective action. *Id.* ¶ 58.

B. **Build Consulting Contract**

In September 2020, the NRC "noncompetitively awarded a federally assisted $343,800 contract to Build Consulting . . . even though none of the circumstances permitting noncompetitive procurement applied to the contract." *Id.* ¶ 59. Ms. Ifill solicited a bid from Build Consulting "many months before NRC solicited bids from any other contractor." *Id.* ¶ 60. The NRC did later solicit bids from other contractors, but those bids were never submitted to the relevant product team for feedback (a routine step before awarding such contracts). *Id.* The NRC also contracted with Build Consulting to both assess problems with and implement solutions for the same product, which violated internal policy and "created a real conflict of interest in violation of PART 200." *Id.*

4

### C.      Cristi Ford

In May 2021, Mr. Moses learned that the NRC's Senior Vice President of Training, Cristi Ford, had awarded and served on the technical evaluation panel for certain contracts even though she "had real conflicts of interest arising from her prior professional and business relationships with key personnel on the contracts."[1]  *Id.* ¶¶ 61-62.  She also had omitted conflict-of-interest attestation documents from the contract files.  *Id.* ¶ 62.  Mr. Moses initially reported his concerns to Mr. Udochi and Mr. Simmons in June 2021, requested a formal investigation, and recommended that they suspend the contracts in question while the investigation was ongoing.  *Id.* ¶ 63.  He received no response.  *Id.* ¶¶ 64-68.

### D.      Multiyear Contracts

In June 2021, Mr. Moses learned that Ms. Esmond, Mr. Simmons, Ms. Rodriguez, and Executive Vice President and Chief Information Officer Mike Huthwaite "were awarding multiyear contracts paid for with annual federal appropriation funds."  *Id.* ¶ 69.  On multiple occasions between June and December 2021, Mr. Moses told these executives "that awarding multiyear contracts paid for with annual federal appropriation funds violated NRC's delegation-of-obligation-authority limits and PART 200" and that the NRC "needed permission from Congress before awarding multiyear contracts paid for with annual federal appropriation funds."  *Id.* ¶ 70.  He told the executives "that he would not cover for them if their unlawful activities were investigated."  *Id.* ¶ 71.  When Mr. Moses encouraged Mr. Simmons to ask Congress if awarding multiyear contracts in this way was permissible, Mr. Simmons responded: "No—I don't want them in our business!"  *Id.* ¶¶ 72-73.

---

[1] Those contracts included: a $124,000 contract with Shine & Rise LLC; a $357,000 contract with the Institute of Inter-Connected Education LLC; a $418,375 contract with Hillstock & Associates; and a $1,250,000 contract with Hillstock & Associates.  ECF No. 12 ¶ 61.

5

### E. Acquisition Threshold

In July 2021, Ms. Esmond told Mr. Moses that "she wanted to raise NRC's simplified acquisition threshold (the threshold for informal procurements) from $20,000 to a range of $50,000-$100,000." *Id.* ¶ 75. She proposed this change to "evade the compliance requirements for federally assisted formal procurements." *Id.* ¶ 76. Mr. Moses opposed the proposal "because he knew it violated NRC policy and PART 200" and explained his position to Ms. Esmond. *Id.* ¶ 77.

In late August 2021, Ms. Germaine told Mr. Moses "that Rodriguez, Huthwaite, Esmond, Ford, and [Senior Vice President of Leadership Brooke] Finn were coercing her and other subordinate employees to evade the PART 200 requirements for formal procurements." *Id.* ¶ 78. Mr. Moses investigated her allegations, confirmed that they were true, reported his concerns to Mr. Udochi, and recommended that he investigate. *Id.* ¶¶ 79-80.

In October 2021, Mr. Udochi told NRC executives—including Ms. Rodriguez, Mr. Huthwaite, Ms. Ifill, Ms. Edmond, and Mr. Simmons—"that he intended to audit all procurement actions on procurements valued above $20,000 because of serious compliance concerns." *Id.* ¶ 81. Ms. Edmond told Mr. Moses that this announcement "made Rodriguez, Huthwaite, and many other NRC higher-ups upset and afraid," and she "confessed to having anxiety because she knew Udochi's audit would expose numerous PART 200 formal procurement violations." *Id.* ¶ 82. Ms. Esmond "excoriated" Mr. Moses for reporting the violations to Mr. Udochi and "for not forewarning her." *Id.*

### F. HUD Grant

In early January 2022, Sophia Dillon (who worked in the NRC's Program Department) told Mr. Moses that Ms. Ford "was using funds from a particular HUD grant to pay for contracts excluded under the grant's terms." *Id.* ¶ 83. The HUD grant was "intended to support the disaster

6

relief assistance efforts of NRC's network organizations," but the contracts in question—including a $124,000 contract with Shine & Rise LLC and a $357,000 contract with the Institute of Inter-Connected Education LLC—"had nothing to do with providing disaster relief assistance." *Id.* Mr. Moses knew that this misuse of grant funds violated Part 200. *Id.* ¶ 85. After investigating and confirming Ms. Dillon's allegations, Mr. Moses reported the violations to Mr. Udochi and requested a formal investigation. *Id.* ¶¶ 84-85.

### G. Meruvia Interview and Mr. Moses's Termination

On January 17, 2022, Guy Meruvia, the NRC's Senior Vice President of Audit, interviewed Mr. Moses "about the rampant procurement-related violations occurring at NRC." *Id.* ¶ 86. Mr. Moses "spared no details": he "reiterat[ed] every report he had made about PART 200 violations since December 2019[,] . . . attributed each violation to the higher-up responsible for committing it, and explained why the violations were illegal." *Id.* ¶ 91. He also "spotlighted issues for the audit department to explore during its investigations." *Id.* "Rodriguez, Simmons, Esmond, Ford, Huthwaite, [Project Lead Tasha] Harris, Ifill, and Finn received a detailed account of Moses's interview right afterward." *Id.* ¶ 92.

On January 20, 2022, just three days after the interview, the NRC "summarily fired" Mr. Moses. *Id.* ¶ 93. "Rodriguez, Simmons, Esmond, Ford, Huthwaite, Ifill, Harris, and Finn participated in the decision to fire him." *Id.* ¶ 94. Before his termination, Mr. Moses had always performed his job well, and the NRC had never warned him about performance issues or taken disciplinary action against him. *Id.* ¶ 95. Mr. Moses claims that, because of the NRC's actions, "[h]is rising career at NRC was destroyed," "[h]is professional reputation has been harmed significantly," he suffered loss of pay and benefits, and he experienced emotional harm. *Id.* ¶ 98.

In the spring of 2022, Congress directed the Government Accountability Office ("GAO") to investigate whether the NRC was complying with Part 200, including the regulation's

7

whistleblower protections. *Id.* ¶ 100. The GAO published its report in June 2023, "spotlight[ing] the minefield of unlawful noncompliance Moses blew the whistle about." *Id.* ¶¶ 101-02.

## II. Procedural History

Mr. Moses filed this action in August 2023, ECF No. 1, and he filed an amended complaint in December 2023, ECF No. 12. He alleges that the NRC unlawfully retaliated against him for whistleblowing, in violation of the NDAA (Count I) and the False Claims Act (Count II), and wrongfully discharged him in violation of public policy (Count III). ECF No. 12 ¶¶ 105-32. He seeks both injunctive relief and damages, including reinstatement and backpay. *Id.* ¶ 133. The NRC moves to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that Mr. Moses has failed to state a claim. ECF No. 14. The motion is now fully briefed. ECF Nos. 14, 17, 18.

## III. Legal Standard

Under Rule 12(b)(6), the court will dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp.*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In evaluating a motion to dismiss under Rule 12(b)(6), the court will accept the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Id.*

## IV. Discussion

### A. The National Defense Authorization Act (Count I)

The NDAA makes it unlawful for employers to discharge or otherwise retaliate against employees for

> disclosing . . . information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a

8

>  Federal contract or grant . . . or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant.

41 U.S.C. § 4712(a).  The NRC argues that Mr. Moses fails to state a NDAA retaliation claim because he did not disclose "evidence of a rule violation related to a *federal contract*."  ECF No. 14-1, at 8.  The NRC is a Congressionally chartered nonprofit organization that receives at least 90% of its funding from federal sources, ECF No. 12 ¶¶ 15, 18—but it is "not a department, agency, or instrumentality of the Federal Government," 24 C.F.R. § 4100.1.  The NRC thus argues that Mr. Moses's allegations relate only to non-governmental contracts—agreements between the NRC and private entities—and that such contracts fall outside the NDAA's scope.  ECF No. 18, at 1-2; *see Ficarra v. SourceAmerica*, No. 19-CV-01025, 2020 WL 1606396, at *4 (E.D. Va. Apr. 1, 2020) (dismissing the plaintiff's NDAA claim where his "disclosure was related only to non-governmental commercial contracts").

But the NDAA does not just apply to federal contracts.  It also protects employees who make disclosures related to federal grants.  *See* 41 U.S.C. § 4712(a)(1); *Omwenga v. United Nations Found.*, No. 15-CV-786, 2019 WL 4860818, at *12 (D.D.C. Sept. 30, 2019) ("*Omwenga I*") (concluding that the plaintiff "believed she was reporting gross mismanagement" of a federal grant under the NDAA where she alleged that her employer charged "unallowable expenses" to a federal grant), *reconsideration granted on other grounds*, 2020 WL 5798428 (D.D.C. Sept. 29, 2020); *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 354 (5th Cir. 2021) ("The NDAA, by its terms, applies to *any* federal . . . grant and is not limited to a particular appropriation or class of grant.").  Mr. Moses alleges that the NRC paid "excess funds" to HPN "by unlawfully charging the associated procurements and transactions to a HUD grant."  ECF No. 12 ¶ 56.  He states that he reported his concerns to Mr. Udochi and Mr. Simmons and requested an internal audit.  *Id.* ¶ 57.  Mr. Moses further alleges that the NRC misused a HUD

grant that was "intended to support the disaster relief assistance efforts of NRC's network organizations," *id.* ¶ 83, because the NRC used those funds to pay for two contracts that "had nothing to do with providing disaster relief assistance" and were "excluded under the grant's terms," *id.* ¶¶ 83, 85.  Mr. Moses claims that he investigated these potential violations himself, reported them to Mr. Udochi, and requested a formal investigation of the matter.  *Id.* ¶¶ 84-85.  Thus, Mr. Moses has plausibly alleged that he disclosed information that he reasonably believed to be evidence of either "gross mismanagement of a Federal . . . grant," "an abuse of authority relating to a Federal . . . grant," or "a violation of law, rule, or regulation related to a Federal . . . grant."  41 U.S.C. § 4712(a); *cf. Ficarra*, 2020 WL 1606396, at *3-4 (dismissing an NDAA claim where the plaintiff did not allege that his disclosure related to a federal grant or federal funds).

In addition to his specific allegations regarding misuse of HUD funds, Mr. Moses makes a broader argument.  He contends that because at least 90% of the NRC's annual budget comes from "federal appropriations and other grants from the US Department of Treasury and HUD," the NRC is required by statute to use any federal funds it receives in accordance with administrative and cost standards codified at Part 200.  ECF No. 12 ¶¶ 18-21; ECF No. 17, at 6; *see* 42 U.S.C. § 8104(e) (requiring the NRC to follow the "administrative and cost standards issued by the Office of Management and Budget similar to standards applicable to non-profit grantees and educational institutions.").  The court can draw the reasonable inference that the NRC paid for the non-governmental contracts at issue in this case with federal grants or appropriations because Mr. Moses had alleged that each contract was federally assisted.  *See id.* ¶ 3 n.5.  It is therefore plausible that, if the NRC violated Part 200 in awarding and administering federally assisted contracts—paid for with federal dollars—it thereby "violat[ed] [a] regulation related to a

Federal . . . grant." 41 U.S.C. § 4712(a)(1). Because Mr. Moses alleges that he discovered and disclosed "numerous PART 200 violations" related to the NRC's federally assisted contracts, the court—drawing all reasonable inferences in Mr. Moses's favor—concludes that he has plausibly alleged disclosures protected by the NDAA. ECF No. 12 ¶ 33.

### B. The False Claims Act (Count II)

"The False Claims Act (FCA), 31 U.S.C. §§ 3729-33, imposes civil liability on any person who presents false or fraudulent claims for payment to the Federal Government." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 423 (2023). Section 3730(h) of the statute protects "whistleblowers who seek to expose or to prevent government fraud." *Singletary v. Howard Univ.*, 939 F.3d 287, 293 (D.C. Cir. 2019). To make out a retaliation claim under the False Claims Act, "a plaintiff must plead facts showing (i) that she engaged in protected activity, (ii) 'because of' which she was retaliated against." *Id.* (quoting *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998)). The NRC argues that Mr. Moses has failed to plausibly allege either that he engaged in protected activity or that he was retaliated against because of that activity. ECF No. 14-1, at 11-12. The court disagrees on both fronts.

#### 1. Protected activity

"Protected activity under the False Claims Act's anti-retaliation provision takes two forms." *Singletary*, 939 F.3d at 295. The first form of protected activity is "lawful acts done . . . in furtherance of an action under this section," 31 U.S.C. § 3730(h)(1)—in other words, "steps taken antecedent to a False Claims Act proceeding," *Singletary*, 939 F.3d at 295. An employee engages in such activity by "'investigat[ing] matters that reasonably could lead to,' or have a 'distinct possibility' of leading to, a 'viable False Claims Act case.'" *Id.* (quoting *Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 66, 68-69 (D.C. Cir. 2008)). The second form of protected activity is "lawful acts done in furtherance of 'other efforts to stop [one] or more violations of' the [Act]." *Id.*

11

(quoting 31 U.S.C. § 3730(h)(1)).  "To put it simply, the focus of the second prong is preventative—stopping 'violations'—while the first prong is reactive to an (alleged) actual violation of the statute."  *Id.* at 296.

No matter which form of protected activity a plaintiff alleges, the False Claims Act "requires that the employee's efforts pertain to fraud in connection with the submission of a claim for federal government funds."  *Id.*  After all, the Act "is not 'an all-purpose antifraud statute' . . . or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 194 (2016) (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008)).  The NRC argues that Mr. Moses fails to plausibly allege that he engaged in protected activity; instead, he made complaints about "(1) purported violations of [the NRC's] own policies and procedures; and (2) purported noncompliance with the Office of Management and Budget Guidance for Grants and Agreements' administrative requirements regarding conflicts of interest and general procurement standards." ECF No. 14-1, at 13.  Such "internal concerns" are, in the NRC's view, "a far cry from evidence of fraudulent claims or certifications to the government."  *Id.*

But the NRC reads the complaint too narrowly.  Mr. Moses "knew NRC was required by law to submit certifications of compliance with PART 200 (as well as other applicable laws and regulations) to the US president, Congress, OMB, and federal awarding agencies at least once a year . . . in order to receive and retain its federal funding." ECF No. 12 ¶ 34.  Because the "NRC did in fact receive and retain federal funds without interruption during his tenure," Mr. Moses knew that it had submitted the relevant certifications promising "to comply with PART 200's requirements for procurements, audits, conflicts of interest, and financial reporting."  *Id.*  And "[b]ecause NRC committed numerous PART 200 violations throughout Moses's tenure, those

representations were false." *Id.* Mr. Moses thus engaged in protected activity by investigating and reporting alleged Part 200 violations because those violations "reasonably could have led to a viable [False Claims Act] action." ECF No. 17, at 27; *see Yesudian*, 153 F.3d at 748 (upholding a retaliation claim where the whistleblower knew that the defendant received 80% of its funds from the federal government and reasonably believed that there was a "distinct possibility" that the defendant had submitted a false claim to the government).

### 2. Retaliation "because of" protected activity

To allege that he was fired "because of" his protected activity, Mr. Moses "must first allege that the [NRC] had knowledge or notice that []he was engaged in protected activity." *Singletary*, 939 F.3d at 300 (citing *Yesudian*, 153 F.3d at 736). The NRC argues that it had no such knowledge because Mr. Moses made his internal complaints "during the normal scope of his responsibilities as a Senior Vice President of Procurement." ECF No. 14-1, at 17. "[P]laintiffs alleging that performance of their normal job responsibilities constitutes protected activity must 'overcome the presumption that they are merely acting in accordance with their employment obligations' to put their employers on notice." *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1261 (D.C. Cir. 2004) (quoting *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 568 (6th Cir. 2003)). "[H]owever, when an employee . . . alerts a party outside the usual chain of command, such action may suffice to notify the employer that the employee is engaging in protected activity." *Id.* That is exactly what Mr. Moses did: "he complained about all the PART 200 violations to Udochi, Simmons, Huthwaite, Rodriguez, and Meruvia—all higher-ups outside his usual chain of command." ECF No. 17, at 36 (citing ECF No. 12 ¶¶ 38, 41, 51, 57, 63, 70-71, 80, 85). The NRC does not dispute that Mr. Moses made these reports outside his chain of command or that such reports are sufficient to put an employer on notice of protected activity. *See*

ECF No. 18, at 8-11.  Any such arguments are therefore forfeited.[2]  *See Am. Waterways Operators v. Regan*, 590 F. Supp. 3d 126, 138 (D.D.C. 2022) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded." (quoting *Day v. D.C. Dep't of Consumer & Regul. Affs.*, 191 F. Supp. 2d 154, 159 (D.D.C. 2002))).

The NRC again urges the court to dismiss Mr. Moses's retaliation claim because he "provides no factual basis for his [False Claims Act] action, nor does he identify any specific certification" at issue.  ECF No. 18, at 10.  But this merely restates the NRC's argument that Mr. Moses failed to sufficiently allege a protected activity, which the court has already rejected.

*       *       *

Because Mr. Moses has plausibly alleged that he engaged in protected activity and that the NRC had notice of such activity, the court will deny the NRC's motion to dismiss his Count II.

### C.    Wrongful Discharge in Violation of Public Policy (Count III)

"[T]he common law tort of wrongful discharge in violation of public policy . . . creates a 'very narrow' exception to the general rule that at-will employees may be discharged at any time for any reason."  *Davis v. Cmty. Alternatives of Wash., D.C., Inc.*, 74 A.3d 707, 709 (D.C. 2013) (quoting *Carl v. Children's Hosp.*, 702 A.2d 159, 159-60 (D.C. 1997) (en banc)).  To make out a wrongful discharge claim, an employee must (1) identify a "policy that has been 'officially declared'" in a statute, a regulation, or the Constitution, and (2) demonstrate a "close fit" between that policy and the conduct he was fired for.  *Id.* (quoting *Fingerhut v. Children's Nat'l Med. Ctr.*,

---

[2] An employee may also put his employer on notice by "act[ing] outside his normal job responsibilities."  *Martin-Baker Aircraft Co.*, 389 F.3d at 1261.  The parties dispute whether Mr. Moses did so here.  *See* ECF No. 17, at 35-36; ECF No. 18, at 9-11.  The court need not reach this question, however, because reporting outside one's chain of command is enough to put one's employer on notice.  *See Martin-Baker Aircraft Co.*, 389 F.3d at 1261 (explaining that an employee puts his employer on notice by "act[ing] outside his normal job responsibilities *or* alert[ing] a party outside the usual chain of command" (emphasis added)).

14

738 A.2d 799, 803-04, 803 n.7 (D.C. 1999)).  However, if another statute already provides a cause of action to enforce that public policy, courts will "defer to the legislature's prerogatives and . . . decline to recognize a novel, competing cause of action for wrongful discharge at common law."  *Robertson v. District of Columbia*, 269 A.3d 1022, 1033-34 (D.C. 2022) (quoting *Carter v. District of Columbia*, 980 A.2d 1217, 1226 (D.C. 2009)).  For example, an employee who alleges that she was fired because of her race could not bring a common-law claim for wrongful discharge; instead, she could seek recourse under Title VII, which enforces the public policy of anti-discrimination in the workplace.  *See id.*

 Mr. Moses claims that he was wrongfully discharged when the "NRC fired him because of his actions in furtherance of the strong public policy against conflicts of interest."  ECF No. 17, at 41.  He alleges that Ms. Ford awarded and served on the technical evaluation panel for certain contracts even though she "had real conflicts of interest arising from her prior professional and business relationships with key personnel on the contracts"; that she omitted conflict-of-interest attestation documents from contract files; that he reported her conflicts to Mr. Udochi and Mr. Simmons in June 2021; and that he again reported his concerns to Mr. Meruvia on January 17, 2022 and was fired three days later.  ECF No. 12 ¶¶ 61-63, 91, 93.  As support, Mr. Moses points to three federal regulations that embody the public policy against conflicts of interest.  ECF No. 17, at 39.  2 C.F.R. § 200.112 requires non-federal entities that receive federal awards to disclose potential conflicts of interest.  2 C.F.R. § 200.318(c)(1) provides that "[n]o employee [of a non-federal entity] . . . may participate in the selection, award, or administration of a contract supported by a Federal award if he or she has a real or apparent conflict of interest."  And 48 C.F.R. § 3.101-1 establishes that "[t]he general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships."

The NRC half-heartedly argues that these regulations do not establish a public policy against conflicts of interest, *see* ECF No. 18, at 11-13, but courts in this district have consistently recognized a public policy against conflicts of interest in government contracting and grantmaking, *see Omwenga v. United Nations Found.*, 244 F. Supp. 3d 214, 221 (D.D.C. 2017) ("*Omwenga II*") (concluding that 2 C.F.R. § 200.112, 2 C.F.R. § 200.318, and 48 C.F.R. § 3.101-1 establish a policy against conflicts of interest); *Omwenga I*, 2019 WL 4860818, at *13 (recognizing that 48 C.F.R. § 3.101-1 establishes a policy against conflicts of interest); *Myers v. Alutiiq Int'l Sols., LLC*, 811 F. Supp. 2d 261, 267 (D.D.C. 2011) (finding that various federal statutes and regulations, including 48 C.F.R. § 3.101-1, "illustrat[e] . . . the strong public policy against conflicts of interest"). The plain language of the regulations on which Mr. Moses relies "officially declare[s]" a public policy against conflicts of interest in government contracting and grantmaking. *Davis*, 74 A.3d at 709 (quoting *Fingerhut*, 738 A.2d at 803); *see Omwenga I*, 2019 WL 4860818, at *13; *Omwenga II*, 244 F. Supp 3d at 221; *Myers*, 811 F. Supp. 2d at 267.

The NRC's main argument is that Mr. Moses's wrongful discharge claim "is foreclosed by the remedies provided under the NDAA and [False Claims Act]." ECF No. 18, at 14. Mr. Moses counters that he "does not rely on the NDAA or the [False Claims Act] for the public policy against conflicts of interest that supports his wrongful discharge claim" and that the whistleblower provisions of those statutes "say nothing about conflicts of interest." ECF No. 17, at 42. The court concludes that the availability of a cause of action under the NDAA precludes Mr. Moses's common-law wrongful discharge claim.

In assessing whether a plaintiff may pursue a claim for wrongful termination, the court must assess whether there is already "a specific, statutory cause of action to enforce" the public policy. *Robertson*, 269 A.3d at 1033 (quoting *Carter*, 980 A.2d at 1226). Here, the NDAA

16

provides that cause of action for retaliation based on reporting conflicts of interest in government contracting and grantmaking. As explained, the NDAA makes it unlawful for employers to discharge or otherwise retaliate against employees for, among other things, "disclosing . . . information that the employee reasonably believes is evidence of . . . a violation of law, rule, or *regulation* related to a Federal contract (including the competition for or negotiation of a contract) or grant." 41 U.S.C. § 4712(a)(1) (emphasis added). The regulations on which Mr. Moses bases his wrongful discharge claim—2 C.F.R. § 200.112, 2 C.F.R. § 200.318(c)(1), and 48 C.F.R. § 3.101-1—are all regulations related to federal contracts and grants. The NDAA need not specifically discuss conflicts of interest because it captures *all* regulations related to federal grantmaking and contracting (including those barring conflicts of interest). *See Busselman v. Battelle Mem'l Inst.*, No. 18-CV-5109, 2019 WL 7763845, at *6-7 (E.D. Wash. Nov. 15, 2019) (finding that the plaintiff's NDAA claim survived a motion for summary judgment where she "strenuously objected that Defendant's actions presented a conflict of interests").

In *Omwenga II*, the court concluded that the NDAA did not preclude the plaintiff's wrongful discharge claim, reasoning that "the same set of facts can support more than one theory of recovery." 244 F. Supp. 3d at 221 (citing Fed. R. Civ. P. 8(d)(2), (3)). The same could be said of a plaintiff who alleges race discrimination in the workplace: the identical set of facts could support recovery under both Title VII and common-law wrongful discharge. But the D.C. Court of Appeals has squarely held that a plaintiff "may not pursue a claim for termination in violation of public policy based on the same factual allegations she asserted in support of her Title VII [claim]." *Robertson*, 269 A.3d at 1033-34. The issue is not whether the same facts can support more than one theory of recovery, it is that "the District's *own* common law extinguishes" a claim for wrongful discharge in violation of public policy when there is a statutory cause of action.

17

*Kassem v. Wash. Hosp. Ctr.*, 513 F.3d 251, 255 (D.C. Cir. 2008); *see Robertson*, 269 A.3d at 1033-34.

Because the NDAA provides a cause of action to enforce the public policy against conflicts of interest in federal contracting and grantmaking, the court "decline[s] to recognize a novel, competing cause of action for wrongful discharge at common law." *Robertson*, 269 A.3d at 1034 (quoting *Carter*, 980 A.2d at 1226). The court will therefore grant the NRC's motion to dismiss as to Claim III.[3]

## V.   Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss, ECF No. 14, is hereby **DENIED** as to Claims I and II, and **GRANTED** as to Claim III. Defendant shall file an answer on or before September 17, 2024. *See* Fed. R. Civ. P. 12(a)(4)(A)

**SO ORDERED**.

/s/ Loren L. AliKhan
LOREN L. ALIKHAN
United States District Judge

Date: September 3, 2024

---

[3] The NRC also argues that the court should dismiss Mr. Moses's wrongful discharge claim "because [his] alleged protected activity regarding conflicts of interest was too distant from his adverse action to support an inference of retaliation." ECF No. 18, at 12-14. Because the court holds that the wrongful discharge claim is unavailable in light of the NDAA, it declines to consider the NRC's alternative argument.